162 So. 191

**ROCHMILL et al. v. NIXON.**

No. 32993.

May 27, 1935.

Fraser & Carroll, of Many, for appellants.

Pickett & Moore, of Many, and W. I. Davis, of Center, Tex., for appellee.

LAND, Justice.

On October 14, 1932, E. S. White and W. C. Atkinson obtained from Mrs. Emmie Patrick et al. and oil and gas lease on the east one-half of southwest one-fourth of section 21, township 9 north, range 13 west, in the parish of Sabine. T. 21.

On November 7, 1932, this lease was assigned by White and Atkinson to Henry Rochmill, one of the plaintiffs. T. 29.

On November 25, 1932, the lease was amended and extended to December 10, 1932, as the date on which the actual drilling should commence. T. 94, 95.

On January 24, 1933, plaintiffs leased a drilling rig from defendant, C. L. Nixon. T. 33.

The well was not commenced until January 29, 1933. Plaintiffs continued to drill for about six or seven days, and reached a depth of about 1,100 feet. Operations were discontinued on February 7, 1933, and the well has never been drilled deeper by plaintiffs, the depth required by the lease being 3,100 feet.

See testimony of N. G. Patrick and Walker Patrick, one of the drillers. T. 190, 194, 195.

The lease in question is known as the "Patrick Lease," and was operated by the partnership of Rochmill & Peeler, the individual members of the firm being Henry Rochmill and Glenn D. Peeler, the lat-

ter having charge of the drilling operations.

Both of the Patricks testified that Glenn D. Peeler admitted to them, three or four different times, that the "Patrick Lease" had expired by its own terms, and that he did not have a lease on the property during the month of April, 1933, and that he would have to secure a new lease before "he dug a well." T. 188, 189, 194.

The record clearly shows that plaintiffs did not obtain a new lease or complete the well already commenced because of financial difficulties.

By suspension of operations on the lease, plaintiffs, in direct violation of the terms of the lease of the drilling rig, allowed defendant's rig to become encumbered with laborers' and materialmen's liens for the debts of the plaintiffs.

It is specifically provided in the written contract of lease of defendant's rig by plaintiffs that: "6. It is further stipulated and agreed that the said contractor binds and obligates itself not to allow or permit any laborers' or materialmen's liens or other encumbrance to be filed or levied against the drilling rig, tools and equipment, and that the said drilling rig, tools and equipment will not, at any time, be liable for any laborers' or materialmen's liens or other encumbrance of said contractor." T. 33, 34.

About March, 1933, three suits were filed in the district court for the parish of Sabine for labor performed and materials fur-

nished in the drilling of the well on the "Patrick Lease," and judgments were obtained recognizing and enforcing the liens on the oil and gas well on the Patrick lease, the derrick and other permanent fixtures on said lease, and also the oil, gas, and mineral lease covering the property.

Defendant bought all of these judgments and paid the purchase price to the sheriff.

The judgment under which the execution sale was made on July 15, 1933, was in the case of T. J. Paul v. Henry Rochmill, No. 11653 on the docket of the district court for the parish of Sabine.

Defendant, through the violation of the terms of the lease of the rig by plaintiffs, had his rig encumbered with laborers' and materialmen's liens, and was forced to come to the parish of Sabine and bid the sum of $1,400 on the property, in order to keep his rig, valued at $5,000, from being adjudicated to plaintiffs, or to some third person, at a sum less than half of its actual value.

The bidding on the sale was competitive. One of the attorneys representing plaintiffs states in his testimony that he received $1,450 from Mr. Rochmill on July 14th, the day before the public sale on July 15th. But neither this amount, nor any other amount, was tendered to the sheriff to pay the liens, nor was any legal tender of this amount, or any other amount, made to defendant, before the sale. T. 161.

The other attorney representing plaintiffs testified that he was present at the sale

and bid on the property in the name of Mr. Farrell, who had sent the money to the firm from Fort Worth, and he supposed it came from his clients, the plaintiffs. T. 162.

Under this state of facts, plaintiffs have brought the present suit for $25,000 damages against defendant, for the breach of an alleged *verbal* contract, by the terms of which they aver, in their petition, that defendant "would advance the money to release said property from the burdens of said liens and suits, and that he would protect the rights of petitioners in the premises *and in the property and would take with them an interest in the said lease and oil well, it being agreed that petitioners would secure the necessary money to repay the said Nixon and proceed with the completion of said well."* (Italics ours.)

Although plaintiffs did not make a legal tender of 1 cent to the sheriff or to defendant before the public sale of July 15, 1933, and defendant was forced to bid on the property to protect his rights, plaintiffs allege that he committed a fraud by so doing, and by obtaining a "top lease" from the Patricks, which later he agreed to assign to plaintiffs, but refused to do so.

■ On the trial of the case, counsel for defendant objected to parol evidence to prove any agreement by defendant to take any interest in the original Patrick lease, or to assign to plaintiffs the "top lease," as it was real property, and the objections,

in our opinion, were properly sustained by the court.

Defendant was well aware that plaintiffs' original lease, by its own terms, had terminated and was of no effect, long before he bought the property at public sale, and so avers in article 16 of his answer.

Why, then, should defendant make any agreement with plaintiffs upon the basis of an interest in an expired lease?

Whether the lease became null and void, by its terms, is immaterial.

It was, at all events, voidable, and defendant acquired no better title to the lease by the adjudication to him at public sale than the plaintiffs then had. For this very reason, defendant, in order to protect his interest, obtained a new lease on the property from the Patricks, which was to be held in escrow, and was not to be delivered to him, until after the public sale on July 15, 1933, for the plain reason that, if defendant should become the adjudicatee at that sale of plaintiffs' original lease, the title to both leases, the old and new, would have been vested in defendant, who, thereafter, completed, in September, 1933, the well commenced by plaintiffs on the property.

■ Plaintiffs do not attack the public sale, at which defendant became the adjudicatee, on any ground whatever; and, as plaintiffs have been legally divested of the original lease by the adjudication to defendant at that sale, we fail to see where-

in they have any interest whatever in the original lease.

It is inconceivable that defendant, after plaintiffs had encumbered his rig with liens for their debts, should have been so gracious as to offer *"voluntarily,"* as testified by one of the plaintiffs, "to pay those claims off and we could reimburse him," and, in addition to this, should have offered to plaintiffs *the new* Patrick lease, the alleged "top lease" in question. T. 114.

If plaintiffs' lease was valid and intact, it is difficult to understand why the plaintiffs, with money in hand, should not have made *a legal tender* to defendant, before the sale, of the amounts due under the judgments assigned to him, which he would have been bound to accept, and thereby have prevented the public sale of the oil well, the original lease, and the equipment thereon.

It jumps to the eye that plaintiffs well knew that their original lease was at an end, and that they considered that a damage suit might prove more profitable than paying off the liens, staying the public sale, and retaining their lease.

Aside from the unreasonableness of the agreement to which plaintiffs have testified, they are both flatly contradicted by defendant and his witness, and one of the plaintiffs has been impeached by two witnesses.

The trial judge heard and saw the witnesses, and, evidently, was not impressed by the testimony of plaintiffs as stating the true facts of the case, and we see no good reason for reaching a different conclusion.

The various items claimed as damages by plaintiffs, and by defendant in reconvention, are largely speculative in character and besides, in our opinion, have not been proved with any reasonable degree of legal certainty.

We find no error in the judgment of the lower court rejecting both demands.

Judgment affirmed.